UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

MURTADA S. EBRAHIM,

               Petitioner,

                                     **No. 10-CV-6397(MAT)**

  -vs-                              **DECISION AND ORDER**

PATRICIA LeCONEY,

               Respondent.

## I.  Introduction

<u>Pro</u> <u>se</u> petitioner Murtada S. Ebrahim ("Petitioner" or "Ebrahim") has filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Ebrahim challenges the constitutionality of a judgment of conviction entered against him on September 26, 2008, in New York State County Court, Wayne County, following a negotiated guilty plea to charges stemming from Ebrahim's alleged commission of Medicaid fraud.

This conviction was found to constitute an "aggravated felony" for purposes of the Illegal Immigration Reform and Immigrant Responsibility Act, and Ebrahim, a native of Sudan, was ordered to be deported. Because United States Immigration and Customs Enforcement ("ICE") was unable to obtain the necessary travel documents from Sudan, Ebrahim was released from ICE custody under an order of supervision.  He has not been deported, and ICE officials have represented to Respondent that obtaining the requisite travel documents from Sudan is "slim to none."

## II.   Factual Background and Procedural History

### A.   The Guilty Plea

In 2007, the New York State Attorney General Office's Medicaid Fraud Control Unit ("MFCU") conducted an investigation M&M Medical Transport, Inc. ("M&M"), of which Ebrahim was the owner and president. MFCU discovered evidence that M&M had been fraudulently billing the State Medicaid program since 2003 for patient transportation services provided by unqualified ambulette drivers or services that M&M actually had not provided. See Respondent's Exhibit ("Resp't Ex.") B at 1-3, 12, 36 (Dkt #12). State officials executed a search warrant at Ebrahim's offices on December 6, 2007, and Ebrahim retained counsel, Rudolph J. LePore ("Attorney LePore").

Over the course of several meetings with prosecutors in March, April, and June 2008, Attorney LePore examined the prosecution's documentary evidence. The parties ultimately negotiated a plea bargain that would resolve all potential State charges. Resp't Ex. B at 12, 57a; Transcript dated July 8, 2008 ("7/8/08 Tr.") at 5-7. Pursuant to the plea agreement, Ebrahim would (1) plead guilty to Grand Larceny in the Third Degree (i.e., wrongfully taking more than $3,000 with the requisite criminal intent, a class D felony) (New York Penal Law ("P.L.") § 155.35); (2) plead guilty to Offering a False Instrument for Filing in the First Degree (i.e, filing a false instrument with the intent to defraud the State, a

-2-

class E felony) (P.L. § 175.35); (3) repay $971,267.76 to the State Medicaid program; and (4) receive an indeterminate concurrent sentence of 2 to 6 years imprisonment on each count. Resp't Ex. B at 12-14; 7/8/08 Transcript ("Tr.") at 24-25, 28-30 (Dkt #12-7). Ebrahim consulted three other experienced attorneys for second opinions on the plea agreement. See 7/8/08 Tr. at 6-7, 27; Resp't Ex. B at 46; 9/24/08 Tr. at 19-20, 25-26 (Dkt #12-7).

On July 8, 2008, the parties appeared in Wayne County Court (Kehoe, J.). Attorney LePore informed the court that, as a result of extensive negotiations, the parties had reached a proposed plea and sentence agreement, and that defense counsel had reviewed it "very thoroughly" with Ebrahim. 7/8/08 Tr. at 6-7. Ebrahim confirmed this synopsis was "all correct," but stated that he needed "fifteen minutes to read [the written agreement]." Id. at 7. The judge granted a recess. Id. at 9, 11.

When the proceedings resumed, the prosecutor explained the terms of the plea agreement. Defense counsel stated that he and Ebrahim had reviewed all the terms of the written plea agreement, and stated that Ebrahim "understands, fully, the consequences of the Plea Agreement . . . and is prepared again to go forward." 7/8/08 Tr. at 12, 17-19. Ebrahim confirmed that he had heard the explanation of the terms of the agreement, had reviewed and discussed them with counsel, and understood them. Id. at 19, 21, 23, 36. Ebrahim verified that he understood English and understood

-3-

the court proceedings; that he had discussed case with Attorney LePore; and had consulted with three other attorneys about the advisability of pleading guilty. Ebrahim affirmed that he was "satisfied" that he "fully" understood the proceeding and what was taking place at the hearing. 7/08/08 Tr. at 25, 27.

Special Assistant Attorney General Jerry Solomon ("SAAG Solomon") noted that Petitioner had been advised that the conviction "could subject him to deportation." 7/08/08 Tr. at 18. SAAG Solomon explained,

> I would mention to the Court as I mentioned to Mr.
> LePore, that our Investigators have talked to people at
> INS and because Mr. Ebrahim is from the Sudan, because of
> the political situation there, it is unlikely that he
> would be deported. That doesn't mean they couldn't still
> do it but they have, at least, advised us that it's
> unlikely, but it would be their prerogative.

Id. at 18. The trial court explained to Ebrahim that no one besides ICE could make any promises in regard to the deportation issue, and confirmed that Ebrahim was not relying on the prosecutor's comments as legal advice. Id. at 19-20. In addition, Ebrahim executed a written plea agreement, explicitly acknowledging as follows: "I understand, and have discussed with my attorney, that my plea in this matter could lead to my deportation from the United States." Resp't Ex. B at 13. Under oath, Petitioner confirmed that he had sufficient opportunity to review and discuss all aspects of the plea agreement with Attorney LePore. 7/08/08 Tr. at 25, 36.

-4-

In response to the trial court's questioning, Ebrahim admitted that he was in fact guilty of each offense as charged, that no one had made any promises to him other than those on the record, and that he was satisfied with Attorney LePore's representation. Id. at 31-34. Ebrahim confirmed that no one had "threatened, forced or coerced [him] to plead [guilty]" and that he was doing so out "of [his] own free will." Id. at 33-34. When the trial court asked whether he had any questions before entering his guilty pleas, Ebrahim replied, "I am all set." Id. at 34-35. The trial court then found that Ebrahim was pleading guilty "knowingly, voluntarily, and intelligently." Id. at 35.

Ebrahim signed the written plea agreement, which stated in pertinent part that Ebrahim was guilty, in fact; that he understood the trial rights he was waiving; that he "ha[d] read completely" and understood the plea agreement; that his guilty plea was "given freely, voluntarily, knowingly, and without coercion of any kind"; that "[n]o threats or promises, except the sentence agreement, ha[d] been made to [him] to induce [him] to plead guilty"; and that he was satisfied with his attorney's representation. 7/8/08 Tr. at 36; Resp't Ex. B at 11, 13-14. The plea agreement also included the following acknowledgment: "I understand, and have discussed with my attorney, that my plea in this matter could lead to my deportation from the United States." Resp't Ex. B at 13.

The trial court released Ebrahim on his own recognizance pending sentencing in late September 2008. 7/8/08 Tr. at 37.

**B.    The Motion to Withdraw the Guilty Plea**

Prior to sentencing, Ebrahim retained new counsel, John V. Elmore, Esq. ("Attorney Elmore"), who, on August 27, 2008, filed a motion to withdraw the guilty plea pursuant to New York Criminal Procedure Law ("C.P.L.") § 220.60. See Resp't Ex. B (Dkt #12-1). Ebrahim argued that his guilty plea was not knowing and voluntary because he is a native speaker of Arabic and therefore could not understand the proceedings and plea agreement without an interpreter. He also asserted that Attorney LePore had coerced him into pleading guilty.

In support of his motion, Ebrahim submitted an affidavit from a former M&M Medical Transport employee averring that he had difficulty understanding written and spoken English. Resp't Ex. B at 30a (Dkt #12-1). He also submitted an affidavit from an Arabic interpreter who reviewed the plea transcript and opined that Ebrahim had understood only 50% of the statements made. Id. at 31b. In an affidavit of his own, Ebrahim alleged that he was innocent. He claimed that Attorney LePore had coerced him at the plea hearing by telling him to "stop the bullshit and sign" or he "would immediately be indicted by a Grand Jury and sentenced to jail for fifteen (15) years." Resp't Ex. B at 29b.

-6-

In opposition, the prosecution submitted affidavits and documentary evidence demonstrating Ebrahim's fluency and comprehension of the English language: Ebrahim had been in the United States for at least seventeen years; had owned and operated at least five businesses in the United States over the past sixteen years (writing numerous letters in English; executing legal documents in English, and conducting civil litigation); had spoken fluent English in numerous conversations with public agency employees between 2002 and 2007; had passed a written driving test in English with a perfect score in 2002; had given investigators a interview in fluent English; and had spoken fluent English in a lengthy conversation with prosecutors and defense counsel on April 25, 2008. <u>See</u> Resp't Ex. B at 46-49 & attached exhibits (Dkt #12-1).

At oral argument on September 24, 2008, defense counsel conceded that Ebrahim "understands English well enough to communicate with people on a daily basis," but argued that Ebrahim could not understand "complicated legal terms" such as the constitutional rights he waived as part of the guilty plea. 9/24/08 Tr. at 10-11, 19 (Dkt #12-7).

Based on Ebrahim's responses, the trial court's observations during the plea colloquy, and the evidence submitted in support of the motion, the trial court reaffirmed its previous finding that

Ebrahim had entered a "knowing, voluntary, and intelligent" guilty plea. Id. at 32-33.

Ebrahim's assigned counsel sought leave to appeal to the Appellate Division, Fourth Department, which was denied.

**C. Sentencing**

On September 26, 2008, Ebrahim was sentenced in accordance with the plea agreement to concurrent, indeterminate terms of imprisonment of two to six years on the Grand Larceny in the Third Degree conviction and one and one-third years to four years on the Offering a False Instrument for Filing conviction. Pursuant to the terms of the plea agreement, the trial court ordered restitution in the amount of $971,267.76. 9/26/08 Tr. at 19-20.

**D. The Direct Appeal**

Represented by new counsel on direct appeal to the Appellate Division, Fourth Department, of New York Supreme Court, Ebrahim argued that the trial court abused its discretion in denying his motion to withdraw his plea and that the failure of his first attorney to alert the trial court to his need for an interpreter constituted ineffective assistance of counsel. The Appellate Division unanimously affirmed the conviction without discussion on November 13, 2009, and denied reargument on February 11, 2010. People v. Ebrahim, 67 A.D.3d 1388 (4th Dept. 2009), rearg. denied, 70 A.D.3d 1419 (4th Dept. 2010). The New York Court of Appeals denied leave to appeal on January 21, 2010. People v. Ebrahim, 13

N.Y.3d 933 (2010). Ebrahim timely sought reconsideration, which was denied on April 8, 2010. recons. denied, 14 N.Y.3d 840 (2010).

**E. First Motion to Vacate the Judgment**

While his direct appeal was pending, Ebrahim filed a pro se motion before the trial court seeking to vacate his judgment of conviction pursuant to New York Criminal Procedure Law ("C.P.L.") § 440.10. See Dkt #9-6. Ebrahim argued that his plea was involuntary because he had a limited understanding of English, was rushed into accepting the plea, and was subjected to psychological coercion. Ebrahim alleged that he was "threaten[ed] off the record" by his attorney with "15 years" in prison if he did not sign the plea agreement. On June 4, 2009, the trial court orally denied the motion on the basis that the arguments raised could be reviewed adequately on his pending direct appeal. See Dkt #12-3 (citing N.Y. CRIM. PROC. LAW § 440.10(2)(b)).[1]

**F.   Second Motion to Vacate the Judgment**

Following the affirmance of his conviction on direct appeal, Ebrahim he filed a second pro se C.P.L. § 440.10 motion, arguing, in relevant part, that he did not understand the plea agreement because of his limited English, that he was innocent, and that he was coerced into pleading guilty out of fear of "fac[ing] the

---

[1]

The order was never entered or appealed, but under the circumstances of this particular case, these procedural infirmities do not affect Ebrahim's habeas petition.

possibility of 15 years" in prison. Petitioner repeated his argument that Attorney LePore had told him off the record that "the Judge wants to throw the book at you," that "if you don't sign, [and] plead today, you will be going to jail today . . . [and] indicted and sentenced to jail for fifteen (15) years." Resp't Ex. P at 3-6 (Dkt # ).

In a written opinion dated May 24, 2010, the trial court denied the motion, observing that it had previously determined, "based on the credible evidence, [Petitioner] understood the nature of his plea and its consequences, and that his understanding of the English language was adequate." Resp't Ex. R at 2-3. The trial court further held that "the majority of [Petitioner's] arguments" were record-based claims that were procedurally barred pursuant to C.P.L. § 440.10(2)(a) and (c). Id. at 4. The trial court refused to credit Petitioner's claim of "off-the-record conversations between himself and his first attorney, during which he was allegedly subjected to coercion by this lawyer to enter a plea," in view of the record as a whole, including Petitioner's own statements during plea colloquy. Resp't Ex. R at 4-5. Permission to appeal the denial of this motion was denied by the Appellate Division on October 1, 2010.

### G.   Third Motion to Vacate the Judgment

After Petitioner filed the instant federal habeas application, see infra at Section II.H, Petitioner filed a third C.P.L. § 440.10

motion on April 1, 2010. Petitioner alleged that he would not have pled guilty had trial counsel advised him that his plea would result in deportation. Petitioner relied upon Strickland v. Washington, 466 U.S. 668 (1984), and Padilla v. Kentucky, 130 S. Ct. 1473, 1486 (2010) (holding that deportation is not a collateral consequence and "counsel must inform her client whether his plea carries a risk of deportation"). The trial court granted Ebrahim's request for counsel and assigned Gregory Power, Esq. ("Attorney Power") of the Wayne County Public Defender's Office to represent him. The trial court also heard oral argument, at which time an Arabic-speaking interpreter was provided. See 8/17/10 Tr. (Dkt #29-8). SAAG Solomon of the New York State Attorney General's Office appeared for the People.

Attorney Power argued that trial counsel should have advised Ebrahim that because he was being convicted of what is considered an "aggravated felony" under the Immigration and Nationality Act ("I.N.A."), the "likelihood . . . of a deportation was extremely high if not 100 percent likely . . . ." 8/17/10 Tr. at 5 (Dkt #12-7). Attorney Power disagreed with SAAG Solomon that the convictions would be considered crimes of moral turpitude, in which case the Attorney General would have "latitude and discretion in terms of the possibility . . . of deportation[.]" Id. at 5,14. SAAG Solomon also argued that Padilla could not be applied retroactively to Ebrahim's case, and that even if it did, trial counsel provided

adequate advice and Ebrahim could not demonstrate he was prejudiced. Id. at 10-15.

To refute Petitioner's affidavit asserting that Attorney LePore "assured [him] that . . . pleading guilty would not expose [him] to deportation," Resp't Ex. V at Issue 2, the prosecutor submitted an affidavit from Attorney LePore detailing his discussions with Petitioner regarding the plea:

> [O]n multiple occasions I advised [Petitioner] that . . . the potential charges he was facing, and the plea that was proposed by the prosecution, were deportable offenses. . . .I informed him that there were no guarantees that he wouldn't be deported and it was a risk he faced either after a plea or upon conviction after a trial.
> . . .
> I discussed the risk of deportation with . . . [Petitioner] on at least three occasions. . .
> [I] absolutely advised [Petitioner] . . . that his plea carried the risk of causing his deportation.

Resp't Ex. Y. See also 8/17/10 Tr. at 12.

The trial court denied the motion on the merits in a written decision dated September 30, 2010. See Resp't Ex. Z (Dkt #12-4). On April 29, 2011, the Appellate Division, Fourth Department, denied leave to appeal. See Resp't Supp. Ex. CC (Dkt # 29).

**H.   The Federal Habeas Petition**

In Petitioner's original habeas corpus petition, filed in this Court on July 2, 2010, he presented the following claims: (1) his guilty plea was not knowing and voluntary, because he did not speak English well enough to understand the plea proceedings; (2) he was denied the effective assistance of counsel, because his counsel

failed to obtain a translator for him); and (3) his guilty plea was "coerced," because of "pressure brought to bear upon [him], not only by [his] attorney, but [by] circumstances," namely "the threat that [he] would be placed in jail immediately, indicted and [his] wife and four children would have to fend for themselves," and that "the Judge wanted to give [him] the max". Petition ("Pet.") at 5.

Permission was granted permission to amend the petition to add the claim raised in his third C.P.L. § 440.10 motion, namely, that trial counsel was ineffective under Padilla and Strickland in failing to properly advise him regarding the deportation consequences attendant to his guilty plea.

Respondent filed a Motion to Dismiss (Dkt #9) as well as a Response and Memorandum of Law (Dkt #12) in opposition to the claims asserted in the original petition as well as a Supplemental Memorandum of Law in opposition to Petitioner's third claim. Petitioner filed a Motion for Summary Judgment (Dkt #23), to which Respondent filed a Supplemental Response (Dkt #29) and Supplemental Memorandum of Law (Dkt #29-9). Petitioner filed a Reply (Dkt #30). Respondent filed a Motion to Strike or Disregard New Evidence (Dkt #31) Appended to Petitioner's Reply (Dkt #30), to which Petitioner filed a Response (Dkt #32).

The matter is now fully submitted and ready for decision. For the reasons that follow, Ebrahim's request for a writ of habeas corpus is denied, and the petition is dismissed. Ebrahim's Motion

for Summary Judgment is denied. Respondent's pre-answer Motion to Dismiss and Respondent's Motion to Strike are denied as moot.

## III. Standard of Review

Ebrahim's petition is governed by the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which revised the conditions under which federal courts may grant habeas relief to a person in state custody, see 28 U.S.C. § 2254. A federal court must defer to a state court's resolution of questions of law and mixed questions of law and fact unless the state court's "adjudication of the claim . . . resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1); see also Williams v. Taylor, 529 U.S. 362, 405-06, 407-08 (2000). Two provisions of AEPDA, 28 U.S.C. § 2254(d)(2) and § 2254(e)(1), deal with factual determinations by state courts. Relief is warranted under § 2254(d)(2) if the state court's "adjudication of the claim . . . resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). Section 2254(e)(1) provides that a state court's factual findings are presumed to be correct, unless the petitioner rebuts them with clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

## IV.   Merits of the Petition

### A.   Ineffective Assistance of Trial Counsel

Ebrahim asserts that trial counsel was deficient in (1) failing to secure the services of an Arabic-speaking interpreter; (2) coercing and threatening Petitioner into pleading guilty; and (3) providing inadequate advice regarding the deportation consequences of Petitioner's guilty plea. All of these claims were adjudicated on the merits in state court. Accordingly, the deferential standard set forth in 28 U.S.C. 2254(d)(1) applies. E.g., Aparicio v. Artuz, 269 F.3d 78, 94 (2d Cir. 2001).

#### 1.   The Strickland Standard

Under the standard promulgated by the Supreme Court in Strickland v. Washington, 466 U.S. 668, supra, a petitioner is required to demonstrate both deficient performance and prejudice as a result of that performance in order to state a successful claim for ineffective assistance of counsel. Id. at 688, 694. "During plea negotiations defendants are 'entitled to the effective assistance of competent counsel.'" Lafler v. Cooper, 132 S. Ct. 1376, 1384 (2012) (quoting McMann v. Richardson, 397 U.S. 759, 771 (1970)). The Supreme Court has held that "the two-part Strickland v. Washington test applies to challenges to guilty pleas based on ineffective assistance of counsel." Hill v. Lockhart, 474 U.S. 52, 58 (1985).

The performance prong of Strickland requires a defendant to show "'that counsel's representation fell below an objective standard of reasonableness[,]'" Hill, 474 U.S. at 57 (quoting Strickland, 466 U.S. at 688), "keep[ing] in mind that counsel's function, as elaborated in prevailing professional norms, is to make the adversarial testing process work in the particular case." Strickland, 466 U.S. at 690. Counsel is "strongly presumed" to have provided effective assistance and to have and made all significant decisions in the exercise of reasonable professional judgment." Id.

With regard to prejudice, "[i]n the context of pleas a defendant must show the outcome of the plea process would have been different with competent advice." Lafler, 132 S. Ct. at 1384 (citing Missouri v. Frye, 132 S.Ct. 1399, 1409 (2012); Hill, 474 U.S. at 59 ("The . . . 'prejudice,' requirement . . . focuses on whether counsel's constitutionally ineffective performance affected the outcome of the plea process")). Thus, a petitioner who pleads guilty and who seeks to establish counsel's ineffectiveness under Strickland "must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." Hill, 474 U.S. at 59.

In the context of federal habeas corpus review of a Strickland claim under § 2254(d)(1) of AEDPA, "[t]he question 'is not whether a federal court believes the state court's determination' under the Strickland standard 'was incorrect but whether that determination

was unreasonable-a substantially higher threshold.'" <u>Knowles v. Mirzayance</u>, 556 U.S. 111, 123 (2009) (quoting <u>Schiro v. Landrigan</u>, 550 U.S. 465, 473 (2007)). "[B]ecause the <u>Strickland</u> standard is a general standard, a state court has even more latitude to reasonably determine that a petitioner has not satisfied that standard." <u>Knowles</u>, 556 U.S. at 123 (citing <u>Yarborough v. Alvarado</u>, 541 U.S. 652, 664 (2004)).

### 2.   Counsel's Alleged Errors

#### a.   Failure to Retain an Arabic-Speaking Translator

As discussed <u>supra</u>, Ebrahim's proficiency in written and spoken English is well-documented in the record. The trial court was justified in determining that he possessed the ability to speak and understand English sufficiently well such that an interpreter was not required at the plea hearing. The Court finds it significant that Ebrahim <u>never</u> requested the services of an interpreter during the plea negotiations or at the plea hearing and never indicated that he was having difficulty understanding what was being said. The times that he did not understand something, he requested clarification and confirmed that he understood the explanation. In addition, Ebrahim had an long-standing relationship with Attorney LePore, who had represented him in matters connected with his various businesses.

The Court cannot say that Attorney LePore's failure to employ an interpreter for his meetings and court appearances with

Petitioner was unreasonable, especially considering the fact that Attorney LePore had no reason to believe that Petitioner was having any difficulty understanding him or the court proceedings. Furthermore, Ebrahim cannot demonstrate that he was prejudiced by Attorney LePore's failure to secure the services of an interpreter because there is no reasonable probability that the outcome of the proceeding would have been different had counsel obtained an interpreter for Ebrahim.

### b.   Coercion by Trial Counsel

Ebrahim contends that his guilty plea was the product of off-the-record psychological coercion and threats by trial counsel. According to Ebrahim, Attorney LePore told him that the trial judge "wanted to give [him] the max" and threatened that he would be placed in jail "immediately" and forced to serve a fifteen-year sentence if he did not go through with the guilty plea. The trial court determined that Ebrahim's claim of off-the-record threats and coercion was refuted by the record as a whole, including Ebrahim's sworn answers to the trial court's questioning. Resp't Ex. R at 4-5.

To this Court, Ebhrahim has offered nothing more than bald assertions that Attorney LePore threatened him. These self-serving statements are unsupported and unsubstantiated by anything in the record. As such, his claim lacks probative evidentiary value. See Ross v. Estelle, 694 F.2d 1008, 1011-12 & n.2 (5th Cir. 1983)

("Absent evidence in the record, a court cannot consider a habeas petitioner's bald assertions on a critical issue in his pro se petition (in state and federal court), unsupported and unsubstantiated by anything else contained in the record, to be of probative evidentiary value.")  (citation omitted).

Furthermore, Ebrahim's claim is contradicted by his own sworn statements at the plea proceeding. When asked whether anybody had forced, threatened, or coerced him into pleading guilty, Ebrahim replied in the negative. He confirmed orally, and by signing the plea agreement, that he was pleading guilty for no other reason than that he had committed the unlawful acts charged; that he had been able to talk to his lawyer and understood what had been told to him; and that the choice to plead guilty was his own.

The Supreme Court has stated that solemn declarations in open court carry a strong presumption of verity. Blackledge v. Allison, 431 U.S. 63, 74 (1977). As a result, a habeas petitioner faces the weighty burden of proving that he is entitled to relief. See id. The critical question is whether the entry of his guilty plea was knowing and voluntary, and in this, "the petitioner has failed to overcome the evidence of his own words." Fountain v. Director, TDCJ-CID, 6:11CV152, 2011 WL 7403019, at *2 (E.D. Tex. Oct. 12, 2011)  (citing United States v. Raetzsch, 781 F.2d 1149, 1151 (5th Cir. 1986) (holding that there must be independent indicia of the likely merit of the petitioner's contentions; mere contradiction of

the statements made at the guilty plea proceeding will not suffice)).

### c. Failure to Properly Advise Petitioner Regarding the Immigration Consequences of the Guilty Plea

Relying upon Padilla v. Kentucky, 130 S. Ct. 1473, 1481-85 (2010), Ebrahim contends that Attorney LePore failed to properly advise him regarding the potential deportation consequences as the result of his guilty plea. Ebrahim contends that the deportation consequences of his conviction by guilty plea were so clear that Attorney LePore should have advised him not merely that the conviction would result in a "risk" of deportation but that the likelihood of being deported would be "almost 100 percent" and that it would be "almost guaranteed that [he] w[ould] be deported as a result of this conviction." 8/17/10 Tr. at 5-8. Ebrahim asserts that but for trial counsel's allegedly erroneous assessment, he would have rejected the plea offer and proceeded to trial.

The trial court denied this claim on the merits finding that Padilla should not apply retroactively and that even if it did, the deportation consequences were not so clear that Attorney LePore's advice amounted to constitutionally deficient performance. Furthermore, the trial court found, Ebrahim could not establish a reasonable probability that he would have gone to trial if he had been told he faced automatic deportation.

### 1.)  **Retroactivity**

The prosecution argued, and the trial court agreed, that Padilla should not apply retroactively to Ebrahim's case because it was decided after Ebrahim's conviction became final.  The trial court applied Padilla notwithstanding this finding and concluded that even under Padilla, trial counsel had provided effective assistance.

This Court requested briefing from Respondent regarding the retroactivity issue.  Respondent argues that although Padilla announced a "new" rule of criminal procedure, retroactivity does not come into play here because Padilla was decided before Ebrahim's conviction became final.[2]  The Court concludes that .

Pursuant to the non-retroactivity doctrine enunciated in Teague, 489 U.S. 288, "new" rules of criminal procedure generally will not be applied to those cases that have become "final" before the new rules are announced.  Id. at 310.  A prisoner's judgment of conviction becomes final under AEDPA when the United States Supreme

---

[2]

The circuit courts are in disagreement as to whether Padilla announced a new rule and whether it applies retroactively to cases on collateral review.  Contrast, e.g., United States v. Orocio, 645 F.3d 630 (3d Cir. 2011) (Padilla followed directly from Strickland and long-established professional norms and is an "old rule" for Teague v. Lane, 489 U.S. 288 (1989), purposes and is retroactively applicable on collateral review); with Chaidez v. United States, 655 F.3d 684, 689-90 (7th Cir. 2011) (Padilla announced a new rule of criminal procedure, since its result was not dictated by existing precedent, and was therefore inapplicable to cases on collateral review, absent applicability of Teague exception).

Court denies the prisoner's petition for a writ of certiorari or the time for seeking such a writ has expired, which is 90 days. Williams v. Artuz, 237 F.3d 147, 148 (2d Cir.), cert. denied, 534 U.S. 924 (2001); Sup. Ct. R. 13(1).

Padilla was decided on March 31, 2010, after the New York Court of Appeals had denied leave to appeal from the Appellate Division's affirmance of the conviction on direct review, but before that court had ruled on Ebrahim's reconsideration motion. Here, Ebrahim did not seek certiorari from the Supreme Court after his reconsideration motion was denied by the New York Court of Appeals. Therefore, his conviction became final on July 7, 2010, 90 days after the New York Court of Appeals denied his request for reconsideration. See Mathieu v. Giambruno, No. 05-CV-8098, 2008 WL 383509, at *9, 12 (S.D.N.Y. Feb. 11, 2008) (finding that petitioner's conviction became final, and the one-year federal habeas limitations period commenced, 90 days after the New York Court of Appeals denied, upon reconsideration, his request for leave to appeal); Mateos v. West, 357 F. Supp.2d 572, 575 (E.D.N.Y. 2005) (same). Thus, Padilla was decided before Ebrahim's conviction became final. See United States v. Becker, 502 F.3d 122, (2d Cir. 2007) ("Becker still had time to petition the Supreme Court for certiorari when Crawford[ v. Washington], 541 U.S. 36 (2004)], was decided and, accordingly, his conviction had not become final for

purposes of <u>Teague</u>. Non-retroactivity is therefore beside the point, and we turn to the merits of the government's appeal.").

**2.)  Whether <u>Padilla v. Kentucky</u> Is "Clearly Established Federal Law"**

Under AEDPA, the "threshold question" is whether the petitioner seeks to apply a rule of law that was "clearly established" by the Supreme Court. <u>Williams v. Taylor</u>, 529 U.S. 362, 390 (2000); 28 U.S.C. § 2254(d)(1). In 2011, the Supreme Court held that the "clearly established Federal law" referenced in § 2254(d)(1) is the law at the time of the relevant state-court adjudication on the merits, not the law at the time conviction becomes final on direct review. <u>Greene v. Fisher</u>, 132 S. Ct. 38, 44, 45 (2011). In <u>Greene</u>, the prosecution introduced the redacted confessions of two of Greene's nontestifying codefendants, and the jury convicted Greene. The intermediate appellate court affirmed the conviction on the merits, reasoning that <u>Bruton</u> did not apply because the confessions were redacted to remove any specific reference to Greene. While Greene's petition to the highest state appellate court was pending, the Supreme Court announced <u>Gray v. Maryland</u>, 523 U.S. 185 (1998), which held that <u>Bruton</u> does apply to some redacted confessions. The state's high court declined to hear Greene's appeal, and Greene sought habeas relief.

Greene argued that <u>Gray</u> should apply because it was decided before his conviction became final on direct review. The district court and Third Circuit held that <u>Gray</u> could not be "clearly

-23-

established Federal law, as determined by the Supreme Court," 28 U.S.C. § 2254(d)(1), for purposes of satisfying AEDPA, because it had not been decided at the time of the relevant state court decision, i.e., the intermediate appellate court's affirmance of Greene's conviction. The Supreme Court affirmed, rejecting Greene's argument that because finality of the conviction "marks the temporal cutoff for Teague purposes, it must mark the temporal cutoff for 'clearly established Federal law' under AEDPA." 132 S. Ct. at 44.

Here, Padilla was issued on March 31, 2010. The relevant state court decision in Ebrahim's case was the trial court's denial of Ebrahim's third C.P.L. § 440.10 motion on the merits on September 30, 2010. Therefore, under Greene, Padilla is clearly established Federal law as determined by the Supreme Court of the United States. The Court accordingly finds that Padilla applies to Ebrahim's claim of ineffective assistance of counsel as raised in the third C.P.L. § 440.10 motion.

### 3.) **Summary of Padilla**

In Padilla, the defendant, a native of Honduras and a lawful permanent resident of the United States for over 40 years, pled guilty in Kentucky to a state-law felony offense involving the trafficking of five or more pounds of marijuana and received an agreed-upon sentence of five years' imprisonment to be followed by five years' probation. In accepting the plea bargain, Padilla

relied on trial counsel's erroneous advice that he "did not have to worry about immigration status since he had been in the country so long." 130 S. Ct. at 1478. Contrary to counsel's advice, Padilla's deportation was a virtual certainty under 8 U.S.C. § 1227(a)(2)(B)(I). Id. In accordance with most of the other courts to have considered the issue, the highest appellate court in Kentucky held that the failure to advise a defendant of a collateral consequence such as deportation does not render counsel's representation ineffective under Strickland.

The Padilla court noted that although many state and federal courts had similarly concluded that a defendant's Sixth Amendment right to effective assistance of counsel was limited to advice about the direct consequences of a guilty plea (e.g., the length of imprisonment), and did not extend to information regarding collateral consequences (e.g., deportation). 130 S. Ct. However, in a majority opinion authored by Justice Stevens, the Padilla court concluded that deportation was "uniquely difficult to classify as either a direct or collateral consequence" and that advice regarding deportation "is not categorically removed from the ambit of the Sixth Amendment right to counsel." 130 S. Ct. at 1482. Noting that it had "never applied a distinction between direct and collateral consequences to define the scope of constitutionally 'reasonable professional assistance' required under Strickland," the Supreme Court declined to consider the appropriateness of

distinguishing between direct and collateral consequences in this context. Id. at 1481. Rather, it found such a distinction "ill-suited to evaluating a Strickland claim concerning the specific risk of deportation." Id. at 1481-82.

The majority based that conclusion on "the unique nature of deportation", in particular, its severity as a penalty and its close relationship to the criminal process. Id. at 1481. Recent changes in federal immigration law, including the Immigration and Nationality Act ("I.N.A.") of 1990, and the Illegal Immigration Reform and Immigrant Responsibility Act ("I.I.R.I.R.A.") of 1996, had served to further "enmesh[] criminal convictions and the penalty of deportation," by making "removal nearly an automatic result for a broad class of noncitizen offenders." Id. at 1478-81. Those changes convinced the Supreme Court that deportation is "an integral part" of the penalty that may be imposed on noncitizens who plead guilty to specified crimes, and therefore it cannot be "divorce[d] . . . from the conviction." Id. at 1480-81. As a result, the Supreme Court concluded that Strickland applied to Padilla's ineffective assistance claim. Padilla, 130 S. Ct. at 1482.

Prevailing professional norms, the Supreme Court held in Padilla, require that counsel "must inform her client whether his plea carries a risk of deportation" in order to satisfy the performance prong of Strickland. Padilla, 130 S. Ct. at 1486

(finding that the American Bar Association and numerous other authorities, dating back to the mid-1990s, had been in agreement that counsel must advise his or her client regarding the risk of deportation). In Padilla, the terms of the relevant immigration statute were "succinct, clear, and explicit," and counsel "easily" could have determined that his plea would make him eligible for deportation simply from reading the text of the statute. Id. at 1483. Because the deportation consequence was "truly clear," the duty to give correct advice was "equally clear." Id. The Supreme Court ruled that "a constitutionally competent counsel would have advised [Padilla] that his conviction for drug distribution made him subject to automatic deportation." Id. at 1478.

The Supreme Court remanded the case to the Kentucky state court to consider, in the first instance, whether Padilla could demonstrate prejudice as the result of counsel's unreasonably deficient advice. In order to do so, Padilla was required to "convince the court that a decision to reject the plea bargain would have been rational under the circumstances." 130 S. Ct. at 1485.[3]

_____

[3]

Prior to Padilla, this issue had not been addressed by the Supreme Court and was the subject of disagreement among jurisdictions. See Padilla, 130 S. Ct. at 1481 & n. 9.

### 4.) The C.P.L. § 440.10 Court's Application of <u>Padilla</u>

In determining the <u>Padilla</u> claim, the trial court found that it "appear[ed]" that Petitioner pleaded guilty to a charge that is considered an "aggravated felony" under I.N.A. as amended by I.I.R.I.R.A. in light of the section defining aggravated felony to include an offense of "fraud or deceit in which the loss to the victim or victims exceeds $10,000[.]" 8 U.S.C. § 1101(a)(43)(M)(I). The immigration statute further provides that "[a]ny alien convicted of an aggravated felony at the time after admission is deportable." 8 U.S.C. § 1227(a)(2)(A)(iii).

The trial court concluded that by entering a plea of guilty to Offering a False Instrument For Filing in the First Degree, for which he was ordered to pay nearly $1 million in restitution, Ebrahim admitted that he had committed a fraudulent offense involving more than $10,000.00. Deeming Ebrahim's conviction to be a variety of "aggravated felony," the trial court concluded he thus was "deportable" under federal law. 9/30/10 Order at 8, Resp't Ex. Z (Dkt #12-4).

The trial court went on to note that it had been unable to locate any statutory definition of the word "deportable" as used in federal immigration law and therefore could not "conclude as a matter of law that the characterization of an offense as 'deportable', without more, affirmatively dictates that 'the deportation consequence (of the plea) is <u>truly clear</u>[.]" 9/30/10

Order at 8 (emphasis in original, quotation omitted). This is an incorrect conclusion of law. Contrary to the trial court's belief that "deportable" is not defined by any federal law, the relevant sections of the I.N.A. read in tandem make clear that being "deportable" means that the alien is subject to mandatory, as opposed to discretionary, removal. E.g., 8 U.S.C. § 1227(a) ("Any alien . . . in and admitted to the United States shall, upon the order of the Attorney General, be removed if the alien is within one or more of the following classes of deportable aliens: . . .") (emphases supplied); see also, e.g., Boakye v. United States, No. 09 Civ. 8217, 2010 WL 1645055, at *5 (S.D.N.Y. Apr. 22, 2010) (cited by the trial court in Ebrahim's case; finding that defendant "pleaded guilty to a statute which made clear that an admission to it made him 'deportable[,]' 8 U.S.C. § 1227(a)(2)(A)(iii)" and "therefore 'his deportation was presumptively mandatory'") (quotation omitted); Al-Bareh v. Chertoff, 552 F. Supp.2d 794, 796 (N.D. Ill. 2008) ("An alien who is convicted of an aggravated felony is considered to be a "deportable alien" and "shall, upon

the order of the Attorney General, be removed. . . .")[4] (quoting
8 U.S.C. § 1227(a); citing 8 U.S.C. § 1227(a)(2)(A)(iii)).

Moreover, even a cursory reading of <u>Padilla</u> would have
answered the question of what is meant by "deportable." Padilla had
been convicted of an aggravated felony, as the trial court found
Ebrahim to have been. Padilla was "deportable" and, as the Supreme
Court found, the deportation consequences were clear: "The
consequences of Padilla's plea could easily be determined from
reading the removal statute, his deportation was presumptively
mandatory [as the result of his conviction of an aggravated
felony], and his counsel's advice was incorrect." <u>Padilla</u>, 130
S. Ct. at 1483.

Thus, if it truly was clear after comparing Ebrahim's crimes
of conviction to the relevant sections of the I.N.A. that he had
been convicted of an "aggravated felony", then he was subject to
mandatory deportation. In such case, Attorney LePore's advice that
Ebrahim merely had a risk of being deported arguably would not

---

[4]

Under 8 U.S.C. § 1226(c)(1)(B), the United States Attorney
General shall take into custody and detain certain deportable
criminal aliens, including aliens who have been convicted of an
aggravated felony as provided in 8 U.S.C. § 1227(a)(2)(A)(iii),
after the alien has been released from confinement imposed pursuant
to the conviciton. <u>See</u> 8 U.S.C. § 1226(c)(1)(B). Generally, a
deportable alien is entitled to removal proceedings conducted by an
immigration judge who must decide whether or not the alien will be
removed from the United States and whether or not the alien is
entitled to any form of relief, such as political amnesty. 8 U.S.C.
§ 1229a(a)(1).

suffice under Padilla. The trial court's understanding of the law and reasoning thus were fatally flawed.

Nevertheless, Ebrahim only can obtain habeas relief if the state court's ultimate conclusion that he did not have a meritorious Padilla claim was an objectively unreasonable application of clearly established Supreme Court precedent. See Harrington v. Richter, 131 S. Ct. 770, 787-88 (2011) ("The question under § 2254(d) is not whether counsel's actions were reasonable, but whether there is any reasonable argument that counsel satisfied Strickland's deferential standard.") (emphasis supplied).

### 5.) Summary of the immigration consequences of Petitioner's guilty plea.

This Court must review the reasonableness of counsel's advice in light of the applicable provisions of the I.N.A., and the cases interpreting those provisions, in effect at the time of counsel's representation. See, e.g., Padilla, supra; Boakye, supra.

"With only a small degree of hyperbole, the immigration laws have been termed second only to the Internal Revenue Code in complexity." Baltazar-Alcazar v. INS, 386 F.3d 940, 948 (9th Cir. 2004). There are two general categories of criminal offenses that render an alien deportable, that is, subject to mandatory deportation: "crimes involving moral turpitude" and "aggravated felonies". See 8 U.S.C. § 1227(a)(2)(A)(I) ("Crimes of moral turpitude") ("Any alien who-(I) is convicted of a crime involving moral turpitude committed within five years (or 10 years in the

case of an alien provided lawful permanent resident status under section 1255(j) of this title) after the date of admission, and (II) is convicted of a crime for which a sentence of one year or longer may be imposed, is deportable."); id., § 1227(a)(2)(A)(ii), "Multiple criminal convictions" ("Any alien who at any time after admission is convicted of two or more crimes involving moral turpitude, not arising out of a single scheme of criminal misconduct, regardless of whether confined therefor and regardless of whether the convictions were in a single trial, is deportable.") (emphasis supplied); id., § 1227(a)(2)(A)(iii), "Aggravated felony" ("Any alien who is convicted of an aggravated felony at any time after admission is deportable.").

As the First Circuit has explained, the term "moral turpitude" first appeared in an 1891 immigration statute and has never been legislatively defined. Da Silva Neto v. Holder, 680 F.3d 25, 28-29 (1st Cir. 2012) (citation omitted). Federal courts have adopted the definition of a CIMT articulated by the Bureau of Immigration Appeals ("BIA") as "conduct that shocks the public conscience as being inherently base, vile, or depraved, and contrary to the accepted rules of morality and the duties owed between persons or to society in general," or, in other words, "an act which is per se morally reprehensible and intrinsically wrong" and is "accompanied by a vicious motive or corrupt mind." Maghsoudi v. INS, 181 F.3d 8, 14 (1st Cir. 1999) (citation and internal quotation marks omitted).

The Court turns first to the question of whether Ebrahim's two convictions should considered to be CIMTs. As noted above, Petitioner pled guilty to one count of New York Penal Law § 155.35 which, at the time of Ebrahim's plea, provided in its entirety that a person was "guilty of grand larceny in the third degree when he steals property and when the value of the property exceeds three thousand dollars." N.Y. PENAL LAW § 155.35, amended L.1986, c.1515, § 2. Respondent asserts that Ebrahim's third degree larceny conviction should be classified as a CIMT because it includes "fraud" as an element. See Resp't Supp. Mem. at 18 (citing Jordan v. DeGeorge, 341 U.S. 223, 227 (1951) (interpreting immigration statute; stating that CIMTs include "crime[s] in which fraud is an ingredient")). The Court agrees. See Matter of Grazley, 14 I. & N. Dec. 330, 332 (BIA 1973) (alien was convicted of "false pretense" under Canadian law, defined under the Canadian criminal code "as a knowing misrepresentation of a past or present fact, made with fraudulent intent to induce the person to whom it is made to act upon it"; BIA held that"[b]ecause of the element of fraud, any of these offenses would be crimes involving moral turpitude") (citing Jordan, 341 U.S. at 232; Burr v. INS, 350 F.2d 87, 91 (9th Cir. 1965), cert. den. 383 U.S. 915 (1966); Matter of McLean, 12 I. & N. Dec. 551, 552 (BIA 1967)); Mendez v. Mukasey, 547 F.3d 345, 350 (2d Cir. 2008) (noting that while an offense under a state larceny statute "does not necessarily constitute a crime involving moral

-33-

turpitude, defrauding a public community does") (internal citation omitted).

Indeed, the conviction of Offering a False Instrument For Filing also constitutes a CIMT. "[M]oral turpitude may inhere in crimes that do not contain fraud as an element. Some courts have read 'fraudulent intent,' and thus moral turpitude, into conduct 'the likely effect of which would be to mislead or conceal.'" Padilla v. Gonzales, 397 F.3d 1016, 1020 (7th Cir. 2005) (quoting Smalley v. Ashcroft, 354 F.3d 332, 337-38 (5th Cir.2003); citation omitted). Consequently, "crimes that involve making false statements have been held to involve moral turpitude." Padilla 397 F.3d at 1020 (citing Zaitona v. INS, 9 F.3d 432, 437 (6th Cir. 1993) (finding moral turpitude where alien made false statements in driver's license application)); see also Padilla, 397 F.3d at 1016 ("Padilla was convicted of knowingly furnishing false information, a crime that specifically entails dishonesty and thus implicates moral turpitude. Moreover, the information makes clear that he furnished false information to a police officer, and almost all courts have held that 'intentionally deceiving the government involves moral turpitude.'") (quoting Omagah v. Ashcroft, 288 F.3d 254, 262 (5th Cir. 2002)).

Ultimately, the United States Department of Homeland Security ("DHS") charged Ebrahim with being deportable because, inter alia, he had been "convicted of a crime involving moral turpitude within

five years after admission for which a sentence of one year or longer may be imposed," Dkt #29-2 ("Notice to Appear"), page 187 of 194 (citing 8 U.S.C. § 1227(a)(2)(I)). Title 8 U.S.C. § 1101(a)(13)(A) of the Act expressly defines the terms "admission" and "admitted" to "mean, with respect to an alien, the lawful entry of the alien into the United States after inspection and authorization by an immigration officer." Here, however, Ebrahim did not have the type of "admission" defined in § 1101(a)(13)(A), as the Notice to Appear ("NTA") indicates that Ebrahim "ha[s] been admitted to the United States" but that he "entered the United States at an unknown place on or about an unknown date." Id. Based on the records submitted, it appears that Ebrahim initially entered the United States without inspection and authorization, and remained here illegally until his subsequent adjustment of status on March 31, 2005, to LPR. In such circumstances, the adjustment of status served as the "admission". See In Matter of Shanu, 23 I&N Dec. 754 (BIA 2005), vacated sub nom. Aremu v. Department of Homeland Security, 450 F.3d 578 (4th Cir. 2006).

In Shanu, the BIA held that the term "admission" used in 8 U.S.C. § 1227(a)(2)(A)(I) referred to an alien's adjustment of status as well as his admission at the border, and that an alien's conviction for a crime involving moral turpitude supported removal under that section so long as the crime was committed within 5 years after the date of any admission made by the alien. Under

<u>Shanu</u>, the law in effect at the time DHS/ICE issued the NTA,[5] Ebrahim's date of admission would have been deemed his date of adjustment to LPR status, since he apparently did not have a lawful admission at the border.

Even though his CIMTs rendered Ebrahim "deportable", they did not preclude him from seeking discretionary cancellation of removal pursuant to 8 U.S.C. § 1229b(a)(1) ("Cancellation of removal for certain permanent residents[.]"). Under § 1229b(a)(1), the "Attorney General may cancel removal in the case of an alien who is . . . deportable from the United States if the alien-(1) has been an alien lawfully admitted for permanent residence for not less than 5 years, (2) has resided in the United States continuously for 7 years after having been admitted in any status, and (3) has not been convicted of any aggravated felony." <u>Id.</u>; <u>contrast</u> <u>with</u> 8 U.S.C. § 1229b(1) (cancellation of removal and adjustment of status for "certain <u>nonpermanent</u> residents" is prohibited if, <u>inter</u> <u>alia</u>, the alien has been convicted of an offense under 8 U.S.C.

---

[5]
    In 2011, however, the BIA overruled the second holding of <u>Shanu</u>, and concluded "instead that a conviction for a crime involving moral turpitude triggers removability under section 237(a)(2)(A)(I) only if the crime was committed within 5 years after the date of the admission by virtue of which the alien was then in the United States." <u>Matter of Alyazji</u>, 25 I. & N. Dec. 397, 398 (BIA 2011) (citation omitted). The BIA explained that "[t]his does not necessarily require that the date of admission be the alien's first, or even his most recent, admission. But it does mean that there is only one 'date of admission' that is relevant to measuring the statutory 5-year period in relation to a particular offense." <u>Id.</u>

§§ 1182(a)(2), 1227(a)(2), or 1227(a)(3), which include CIMTs) (emphasis supplied).

Respondent asserts, however, that Ebrahim would not have been eligible for discretionary cancellation of removal under 8 U.S.C. § 1229b(a)(1) because he could not show that he was a permanent resident for "not less than 5 years." Id. Ineligibility for discretionary cancellation of removal is undoubtedly a negative deportation consequence of Ebrahim's plea, but Respondent failed to address counsel's advice in this regard. If Respondent is correct, and Ebrahim categorically was not eligible for cancellation of removal, this arguably would have meant that his deportation was presumptively automatic. Clearly, this would support Petitioner's argument that trial counsel's advice was inadequate.

However, it appears that Respondent's calculation of the five years is inaccurate. Respondent relies upon a D.H.S. charging document dated April 9, 2010, indicating that Petitioner became a permanent resident "'on February 16, 2006[,] as of March 31, 2005.'" Resp't Supp. Mem. at 18 n.13 (quoting Ex. H to Resp't Supp. Ex. AA). Respondent did not state which of these dates applied, analyze how she arrived at her conclusion, or provide any legal authority to support her assumptions. The Court infers that Respondent assumed Petitioner's permanent resident status terminated on the date of his guilty plea (July 8, 2008). If so, then he would not have been a permanent resident for "not less than

-37-

5 years", since his permanent resident status commenced on either February 16, 2006, or March 31, 2005, according to the charging document.

However, the caselaw indicates that the removal, rather than the conviction that may have led to the removal, is the endpoint for measuring the five years under § 1229b. See Padilla-Romero v. Holder, 611 F.3d 1011, 1012 (9th Cir. 2010) (per curiam) ("It is undisputed that at the time he was removed [for attempting to smuggle aliens and falsely claiming to be a United States citizen], Padilla-Romero was a lawful permanent resident ("LPR") of the United States . . . . It is likewise undisputed that . . . the first removal terminated his status as an LPR.") (emphasis supplied). Respondent cites no authority for the proposition that LPR status is terminated at the time an alien is convicted of a crime that later renders him deportable, and the Court has found none. Instead, it appears that Ebrahim did not lose his LPR status upon pleading guilty in 2008. See Padilla-Romero, 611 F.3d at 1012. Therefore, Ebrahim might have been eligible for discretionary cancellation of removal, depending upon if and when the Government ordered him removed. See id. Thus, although the Court finds that Respondent is incorrect, it nevertheless finds that the error ultimately does not change the outcome of the case.

The Court now turns to the second category of offenses that result in mandatory deportation, "aggravated felonies". Aggravated

felonies are listed in 8 U.S.C. § 1101(a)(43), which specifies both
particular crimes and general categories of crimes. Among the
general categories of crimes that constitute aggravated felonies
are "theft offense[s] . . . for which the term of imprisonment [is]
at least one year," 8 U.S.C. § 1101(a)(43)(G), and "offense[s] that
. . . involve[ ] fraud or deceit in which the loss to the victim or
victims exceeds $10,000," id., § 1101(a)(43)(M)(i). As noted above,
Petitioner pled guilty to one count of New York Penal Law § 155.35,
which, at the time of Ebrahim's plea, provided in its entirety that
a person was "guilty of grand larceny in the third degree when he
steals property and when the value of the property exceeds three
thousand dollars." N.Y. PENAL LAW § 155.35, amended L.1986, c.1515,
§ 2.

    At the time of his third C.P.L. § 440.10 motion, counsel
argued that Ebrahim's third degree larceny conviction constituted
a "theft offense" within the definition of an aggravated felony in
8 U.S.C. § 1101(a)(43)(G). The prosecution disagreed, and the trial
court did not address this contention. Respondent argues that at
the relevant time, the larceny conviction did not constitute a
theft offense. This Court agrees with Respondent.

    According to the BIA, a "theft offense" "ordinarily requires
the taking of, or exercise of control over, property without
consent and with the criminal intent to deprive the owner of the
rights and benefits of ownership, even if such deprivation is less

-39-

than total or permanent." Matter of Garcia-Madruga, 24 I. & N. Dec. 436, 436, 2008 WL 192487 (BIA Jan. 17, 2008) (citation omitted). In Garcia-Madruga, the BIA clarified that "[w]hereas the taking of property without consent is required for a section 101(a)(43)(G) [8 U.S.C. § 1101(a)(43)(G)] 'theft offense,' a section 101(a)(43)(M)(I) [8 U.S.C. § 1101(a)(43)(M)(I)] 'offense that involves fraud or deceit' ordinarily involves the taking or acquisition of property with consent that has been fraudulently obtained[.]" Garcia-Madruga, 24 I. & N. Dec. at 440 (footnote omitted; emphases added). Accordingly, in Garcia-Madruga, the BIA held that the alien's offense of welfare fraud under section 40-6-15 of the General Laws of Rhode Island did not constitute the taking of, or exercise of control over, property without consent and with the criminal intent to deprive the owner of the rights and benefits of ownership, and therefore the alien had not been convicted of a "theft offense." Id.

The Court therefore agrees with Respondent that Ebrahim's conviction of third degree larceny is not a "theft offense" within the ambit of 8 U.S.C. § 1101(a)(43)(G) because it involved a taking that was consensual, although the consent was fraudulently obtained.[6] See Matter of Garcia-Madruga, 24 I. & N. Dec. 436, 436,

---

[6] "New York law defines larceny in a variety of ways, encompassing some offenses that involve theft as well as some that involve fraud and deceit." Bazuaye v. Mukasey, 273 Fed. Appx. 77, at *77, 2008 WL 1714392, at **1 (2d Cir. Apr. 11, 2008) (unpublished opn.) (citing N.Y. PENAL LAW § 155.05 (Larceny; defined)). Section 155.05 of New York's Penal Law

2008 WL 192487. The issue becomes whether the third degree larceny conviction falls into the other category of "aggravated felonies" at potentially implicated here, namely, "offense[s] that . . . involve[ ] fraud or deceit in which the loss to the victim or victims exceeds $10,000," id., § 1101(a)(43)(M)(i).

Neither defense counsel nor the trial court addressed the possibility that Ebrahim's third degree larceny conviction could constitute an aggravated felony in the category of "offense[s] that . . . involve[ ] fraud or deceit in which the loss to the victim or victims exceeds $10,000," 8 U.S.C. § 1101(a)(43)(M)(i). The trial

---

defines larceny, in pertinent part, as follows:

> 1. A person steals property and commits larceny when, with intent to deprive another of property or to appropriate the same to himself or to a third person, he wrongfully takes, obtains or withholds such property from an owner thereof.
>
> 2. Larceny includes a wrongful taking, obtaining or withholding of another's property, with the intent prescribed in subdivision one of this section, committed in any of the following ways:
>
>   (a) By conduct heretofore defined or known as common law larceny by trespassory taking, common law larceny by trick, embezzlement, or obtaining property by false pretenses; . . .
>
>   (d) By false promise.
>
>   A person obtains property by false promise when, pursuant to a scheme to defraud, he obtains property of another by means of a representation, express or implied, that he or a third person will in the future engage in particular conduct, and when he does not intend to engage in such conduct or, as the case may be, does not believe that the third person intends to engage in such conduct. . . .

N.Y. PENAL LAW § 155.05.

-41-

court instead concluded that Ebrahim's conviction for Offering a False Instrument for Filing in the First Degree was a "fraud or deceit offense" for purposes of 8 U.S.C. § 1101(a)(43)(M)(i) because Ebrahim had been ordered to pay restitution in an amount greater than $10,000.

Respondent argues that under the Second Circuit law in effect at the time of Ebrahim's plea, neither conviction constituted an offense involving fraud or deceit in which the victim's loss exceeded $10,000. See Dulal-Whiteway v. United States Dept' of Homeland Security, 501 F.3d 116, 121, 131 (2d Cir. 2007) (holding that alien who had been convicted under a statute criminalizing fraudulent use of an access device to obtain $1,000 or more, and who had been ordered to pay $20,000 in restitution, was not convicted of an "aggravated felony" involving fraud or deceit in which the loss exceeded $10,000). The Court agrees.

Ebrahim pled guilty to Grand Larceny in the Third Degree, which has a value threshold of only $3,000, see N.Y. PENAL LAW § 155.35(1). He also pled guilty to Offering a False Instrument for Filing in the First Degree, which does not involve obtaining any property whatsoever, see N.Y. PENAL LAW § 175.35. Thus, as Respondent argues, although Petitioner agreed to pay nearly one million dollars in restitution, a $10,000-loss to the victim is not a fact to which Petitioner would "necessarily plead in order to establish the elements[,]" Dulal-Whiteway, 501 F.3d at 131, of either

-42-

offense.[7] Furthermore, during the plea colloquy regarding the grand larceny count, Petitioner initially admitted being paid $971,278 to which he was not entitled. After an off-the-record colloquy held at Attorney LePore's request, the trial court revisited that count, and required Petitioner only to admit to the $3,000 threshold contained in the statute. See 7/08/08 Tr. at 28-31. Thus, at the time of Ebrahim's guilty plea, neither Grand Larceny in the Third Degree nor Offering a False Instrument for Filing in the First Degree constituted an aggravated felony under either 8 U.S.C. § 1101(a)(43)(G) or 8 U.S.C. § 1101(a)(43)(M)(i) which would have rendered him "deportable".

Based upon this Court's reading of the caselaw and statutory authority, it appears that at the time of Ebrahim's plea, neither Grand Larceny in the Third Degree nor Offering a False Instrument for Filing in the First Degree constituted an aggravated felony under either 8 U.S.C. § 1101(a)(43)(G) (theft offenses) or 8 U.S.C. § 1101(a)(43)(M)(i) (fraud or deceit offenses involving a $10,000-

---

[7]

The Supreme Court subsequently decided Nijhawan v. Holder, 129 S. Ct. 2294, 2298 (2009), which abrogated this aspect of Dulal-Whiteway. Now, under Nijhawan, the immigration authorities may consider the specific circumstances of the offense committed by the alien, and not merely the elements of the generic offense. See Nijhawan, 129 S. Ct. at 2302-03 (holding that an immigration judge is not limited to considering the evidentiary materials permitted under the modified categorical approach when determining whether the loss involved in a prior fraud or deceit conviction amounted to at least $10,000); see generally Akinsade v. Holder, 678 F.3d 138, 144 (2d Cir. 2011) (explaining effect of Nijhawan on Second Circuit precedent).

loss to the victim). Therefore, neither of these two convictions were "aggravated felonies" at the time Ebrahim pled guilty. As such, he was not rendered "deportable" (and thus subject to mandatory deportation) by pleading guilty to an "aggravated felony", as was the case in <u>Padilla</u>.

However, both of Ebrahim's convictions qualified as CIMTs, which does constitute an alternative basis for finding him "deportable", as discussed above. When an alien such as Ebrahim has convictions for CIMTs, the statute provides the Attorney General with the authority to cancel removal if certain criteria are met, <u>see</u> 8 U.S.C. § 1229b(a) ("Cancellation of removal for certain permanent residents"). The Court reads the statutes and caselaw as holding out the possibility that Ebrahim could have qualified for this discretionary cancellation of removal. Thus, it was not unreasonable for trial counsel, in light of prevailing professional norms in place at the time, to have advised Ebrahim that he faced a <u>risk</u> of deportation, rather than informing Ebrahim that his deportation was a certainty.

The Court recognizes that these specific topics (e.g., cancellation of removal) do not appear to have been discussed with Ebrahim. However, as the Supreme Court noted in <u>Padilla</u>, "[i]mmigration law can be complex, and it is a legal specialty of its own." <u>Padilla</u>, 130 S. Ct. at 1483. The Supreme Court recognized that "[t]here will, therefore, undoubtedly be numerous situations

in which the deportation consequences of a particular plea are unclear or uncertain." Id.   This Court's extended discussion, supra, illustrates that point. In complicated cases such as Ebrahim's, the Supreme Court noted, "[t]he duty of the private practitioner in such cases is more limited[,]" and "[w]hen the law is not succinct and straightforward . . . , a criminal defense attorney need do no more than advise a noncitizen client that pending criminal charges may carry a risk of adverse immigration consequences." Id. (emphasis supplied). Ebrahim thus has failed to demonstrate that trial counsel's advice fell outside the bounds of reasonable professional conduct as delineated in Padilla.

On the issue of prejudice, the trial court was not objectively unreasonable in determining that Ebrahim had not established a reasonable probability that he would have insisted on going to trial had he been informed that his deportation was essentially mandatory. As the trial court noted, the MFCU had amassed an extensive amount of evidence showing Ebrahim's culpability. Ebrahim was well aware of the proof against him, having reviewed the prosecution's file with Attorney LePore, as well as three other attorneys. In addition, if he had been convicted of Grand Larceny in the Second Degree, Ebrahim faced an indeterminate sentence with a minimum of five years and a maximum of fifteen years. Ebrahim's allegations in support of his other habeas claims make clear that he was extremely concerned about avoiding lengthy incarceration.

Given these countervailing factors, the trial court did not unreasonably reject Ebrahim's conclusory allegations that he would have proceeded to trial but for trial counsel's advice.

As discussed above in this Decision and Order, however, the trial court erred in an objectively unreasonable manner when it found there was an "absence of any definitive statutory or case law defining the specific consequences of a plea to an aggravated felony," and therefore trial counsel provided "objectively reasonable" advice regarding the deportation issues. However, as this Court has explained, trial counsel's advice was not objectively unreasonable. Because there is an alternative, reasonable basis for finding that trial counsel provided constitutionally effective assistance, habeas relief under § 2254(d)(1) is unwarranted.

**B.     Involuntary Guilty Plea Based on Lack of an Interpreter**

Ebrahim contends that his guilty plea was not knowing, voluntary and intelligent because he is a native Arabic speaker and could not understand the plea proceedings without a translator. This claim was adjudicated on the merits by the state court, and therefore habeas relief is available only if the state court's ruling was contrary to, or an involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court. See 28 U.S.C. 2254(d)(1).

The due process clause of the Fourteenth Amendment requires that a guilty plea be "a voluntary and intelligent choice among the alternative courses of action open to the defendant." Hill v. Lockhart, 474 U.S. 52, 56 (1985). "It is beyond dispute that the Supreme Court's decision in Boykin v. Alabama, 395 U.S. 238 (1969) was, . . . , and continues to be 'clearly established Federal law' for the proposition that the trial court must produce a record affirmatively showing that the defendant's guilty plea was knowing and voluntary." Hanson v. Phillips, 442 F.3d 789, 797 (2d Cir. 2006) (citations omitted).

The linchpin of Ebrahim's involuntariness claim is that he lacked sufficient proficiency in English to make the decision to plead guilty knowing and intelligent. "The question of [a] petitioner's ability to understand English is a question of historical fact." Fernandez v. Rodriguez, 761 F.2d 558, 569 (10th Cir. 1985) (citing, inter alia, Marshall v. Lonberger, 459 U.S. 422, 103 S. Ct. 843, 848-49 (1983) (in determining validity of guilty plea, finding that respondent was "an intelligent individual, well versed in the criminal processes and well represented in all stages of the proceedings by competent and capable counsel," and the inferences fairly deducible from these facts are entitled to presumption of correctness)). "Although a

lack of fair support in the record[8] was sufficient to rebut a presumptively correct factual finding under pre-AEDPA law, . . . AEDPA increased the level of deference due to a state court's factual findings." Fields v. Thaler, 588 F.3d 270, 278 (5th Cir. 2009) (citations omitted).

Regarding the interplay of the new AEDPA sections dealing with factual determinations, the Supreme Court has explained that the "clear and convincing evidence" standard found in § 2254(e)(1) "pertains only to state-court determinations of factual issues, rather than decisions [i.e., adjudications][,]" while § 2254(d)(2) "contains the unreasonable requirement and applies to the granting of habeas relief . . . ." Miller-El v. Cockrell, 537 U.S. at 341-42.[9] There remains a split among the circuit courts regarding whether and when the § 2254(e)(1) presumption is applicable during a § 2254(d)(2) review. Fields v. Thaler, 588 F.3d at 279 (compiling cases). The Supreme Court granted certiorari in Wood v. Allen, 129 S. Ct. 2389 (2009), on the issue but ultimately did not resolve it.

---

[8]
"Pursuant to then-effective § 2254(d)(8), an exception to the presumption of correctness existed when a state court's factual determination was not fairly supported by the record." Pondexter v. Dretke, 346 F.3d 142, 149 n. 9 (5th Cir. 2003).

[9]
Miller-El involved a claim of racial discrimination during jury selection. The Supreme Court that "[t]o secure habeas relief, petitioner must demonstrate that a state court's finding of the absence of purposeful discrimination was incorrect by clear and convincing evidence, 28 U.S.C. § 2254(e)(1), and that the corresponding factual determination was 'objectively unreasonable' in light of the record before the court." 537 U.S. at 348.

See Wood v. Allen, 558 U.S. ___, 130 S. Ct. 841, 845 (2010) ("We conclude . . . that the state court's factual determination was reasonable even under petitioner's reading of § 2254(d)(2), and therefore we need not address that provision's relationship to § 2254(e)(1)."); & id., 130 S. Ct. at 849 ("We therefore do not need to decide whether that determination should be reviewed under the arguably more deferential standard set out in § 2254(e)(1).").

However, the issue on which the circuits are split-that is, the question whether § 2254(e)(1) applies when, as in Ebrahim's case, the petitioner's claim is based only on evidence that was presented in state court-is not outcome-determinative. Assuming that § 2254(e)(1) applies, federal courts have examined the state record to find support for the state court's factual determinations. E.g., Martini v. Hendricks, 348 F.3d 360 (3d Cir. 2003).

In support of his motion, Ebrahim submitted an affidavit from a former M&M Medical Transport employee averring that he had difficulty understanding written and spoken English. Resp't Ex. B at 30a. He also submitted an affidavit from an Arabic interpreter who reviewed the plea transcript and opined that Ebrahim had understood only 50% of the statements made. Id. at 31b. In an affidavit of his own, Ebrahim alleged that he was innocent. He claimed that Attorney LePore had coerced him at the plea hearing by telling him to "stop the bullshit and sign" or he "would

-49-

immediately be indicted by a Grand Jury and sentenced to jail for
fifteen (15) years." Resp't Ex. B at 29b.

In opposition, the prosecution submitted affidavits and
documentary evidence demonstrating Ebrahim's fluency and
comprehension of the English language: Ebrahim had been in the
United States for at least seventeen years; had owned and operated
at least five businesses in the United States over the past sixteen
years (writing numerous letters in English; executing legal
documents in English, and conducting civil litigation); had spoken
fluent English in numerous conversations with public agency
employees between 2002 and 2007; had passed a written driving test
in English with a perfect score in 2002; had given investigators a
interview in fluent English; and had spoken fluent English in a
lengthy conversation with prosecutors and defense counsel on
April 25, 2008. See Resp't Ex. B at 46-49 & attached exhibits.

At oral argument on September 24, 2008, defense counsel
conceded that Ebrahim "understands English well enough to
communicate with people on a daily basis," but argued that Ebrahim
could not understand "complicated legal terms" such as the
constitutional rights he waived as part of the guilty plea. 9/24/08
Tr. at 10-11, 19.

Representations at a plea hearing, "as well as any findings
made by the judge accepting the plea, constitute a formidable
barrier in any subsequent collateral proceedings. Solemn

declarations in open court carry a strong presumption of verity." Blackledge v. Allison, 431 U.S. 63, 73-74 (1977). During the lengthy plea colloquy, Ebrahim stated under oath that he understood English. After he was advised of the charges, his constitutional rights, his sentence, and the potential immigration consequences of pleading guilty, he affirmed that understood the terms of the plea agreement, and that he had fully discussed all pertinent matters with counsel. The written plea agreement, signed by Ebrahim and his counsel in open court, confirmed this in writing.

Throughout the plea colloquy, Ebrahim answered the court's questions readily and intelligibly in English without the assistance of a translator. Where a question called for a narrative answer, Ebrahim's response not only was clear and coherent, but demonstrated a proficiency in English:

> THE COURT: Are you being treated by a Doctor for something? Can you tell me what?
> THE DEFENDANT: High blood pressure, diabetes. I had a stroke back in February, mini stroke.
> . . .
>
> THE COURT: Can you tell me what you take as medication.
> THE DEFENDANT: I take Metformin for diabetes and Glipizide, ten milligram. And I take Lipitor and — what's the—for blood pressure. And I take Lovastat for cholesterol. Lovastat for cholesterol. And I take a blood thinner called Aggrenox.

7/8/08 Tr. at 26.

On occasion, when Ebrahim did not understand a question, he spoke up. After receiving an explanation, Ebrahim confirmed his understanding of what had been said. See 7/8/08 Tr. at 7-8, 22-23,

32-33. At no time did Ebrahim, Attorney LePore, or any other individual present at the plea hearing suggest that Ebrahim might need a translator to understand what was being said.

When Ebrahim subsequently moved to withdraw his plea, the prosecution responded with substantial evidence that Ebrahim was a university graduate who had owned and operated businesses in the United States for at least sixteen years, and had conversed in fluent English with State investigators and prosecutors during the fraud inquiry and plea negotiations.

In sum, the record lacks clear and convincing evidence to rebut the state court's determination that Ebrahim had enough fluency in English to be able to knowingly, intelligently and voluntarily plead guilty. Furthermore, Ebrahim cannot establish that the state court's decision regarding his ability to understand English was unreasonable in the light of the evidence presented in the state court proceeding, which he must do in order to obtain habeas relief pursuant to § 2254(d)(2).

### C.   Involuntary Guilty Plea – Coercive Circumstances at Plea Hearing

Ebrahim contends that his guilty plea was involuntary because it was the product of the coercive "circumstances" of the plea proceeding conducted on July 8, 2008.  In any event, even under a pre-AEDPA standard of review, it does not warrant habeas relief.

Due process requires that a guilty plea be a "voluntary and intelligent choice among the alternative courses of action open to

the defendant." North Carolina v. Alford, 400 U.S. 25, 31 (1970). The prosecution is not precluded from compelling a defendant to choose between "grim alternatives," id. at 36, so long as there are no threats or misrepresentations. Brady v. United States, 397 U.S. 742, 755 (1970). Thus, the prosecutor may present the defendant "with the unpleasant alternatives of forgoing trial or facing charges on which he [i]s plainly subject to prosecution" without offending the due process clause of the Fourteenth Amendment. Bordenkircher v. Hayes, 434 U.S. 357, 365 (1978). Similarly, a guilty plea is not the product of improper coercion where it is induced "by the fear of a possibly higher penalty." Brady, 397 U.S. at 750-51.

As Respondent argues, there was nothing improper about the fact that prosecutor intended to seek a grand jury indictment if Ebrahim refused to waive indictment and consent to prosecution by felony information. Moreover, there is no indication that an such indictment would have been unfounded, or that the felony complaint lacked a factual basis. Ebrahim and his attorney had been permitted to review all of the documentary proof the prosecutor intended to present to the grand jury. Ebrahim's subsequent decision not to risk a trial presumably was based, at least in, part on what he perceived to be the strength of the prosecution's case against him. Finally, it was not improperly coercive for the prosecutor to state that the day of the plea hearing was "the last day for the plea

offer." 7/08/08 Tr. at 7, 8. See Weatherford v. Bursey, 429 U.S. 545, 561 (1977) ("[T]here is no constitutional right to plea bargain; the prosecutor need not do so if he prefers to go to trial."). As Respondent argues, the record does not reveal any "coercion" apart from the "ordinary pressures, risks and choices that a criminal defendant may face" during the plea bargaining process. Resp't Supp. Mem. at 21.

**Conclusion**

For the reasons discussed above, the request for a writ of habeas corpus is denied, and the petition filed by Murtada Ebrahim is dismissed. As Ebrahim has not made a substantial showing of the denial of a constitutional right, the Court declines to issue a certificate of appealability. See 28 U.S.C. § 2253(c)(2).

Petitioner must file any notice of appeal with the Clerk's Office, United States District Court, Western District of New York, within thirty (30) days of the date of judgment in this action. Requests to proceed on appeal as a poor person must be filed with United States Court of Appeals for the Second Circuit in accordance with the requirements of Rule 24 of the Federal Rules of Appellate Procedure.

**IT IS SO ORDERED.**

S/Michael A. Telesca

————————————————————
HONORABLE MICHAEL A. TELESCA
United States District Judge

Dated:      December 11, 2012
            Rochester, New York.